UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
REYNAULT CHEVALIER,

                                    Plaintiff,

        - against -                                    **OPINION & ORDER**

CITY OF NEW YORK; DEPUTY SHERIFF JOSE              No. 18-CV-5048 (CS)
MARZON; SERGEANT JAMAL WILLIAMS;
DEPUTY SHERIFF DEANNA BUNCH; DEPUTY
SHERIFF JOHN MESA,

                                    Defendants.
-------------------------------------------------------------x

<u>Appearances</u>:

Reynault Chevalier
Bronx, New York
*Pro se Plaintiff*

Nakul Y. Shah[1]
Hannah Faddis
Andrew Spears
New York City Law Department
New York, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

        Before the Court is the motion for summary judgment of Defendants City of New York

(the "City"), Deputy Sheriff Jose Marzon, Sergeant Jamal Williams, Deputy Sheriff Deanna

Bunch, and Deputy Sheriff John Mesa, (collectively, "Defendants").  (Doc. 33.)

---

        [1] Shah is no longer an Assistant Corporation Counsel at the New York Law Department
and no longer represents Defendants in this case.

I.    **BACKGROUND**

The following facts are based on Defendants' Local Civil Rule 56.1 Statement, (Doc. 36

("Ds' 56.1 Statement")), Plaintiff's Response, (Doc. 40 (P's Opp.") at 3-5), and the supporting

materials, and are undisputed unless otherwise noted.

A.    **Facts**

On March 14, 2018, Plaintiff noticed a yellow scofflaw boot on the rear wheel of his

vehicle.  (Ds' 56.1 Statement ¶ 1.)  That same day, Plaintiff called the New York City

Department of Finance ("NYC DOF").  (*Id.* ¶ 3.)  Mr. Chevalier was connected with an

individual who identified herself as "Jamie," and Chevalier told Jamie, "I want to find out where

the office where these scofflaw people work at, because right now, there's no turning back.  I'm

going to avenge this matter.  I want to know where these people work at."  (Doc. 35 ("Shah

Decl.") Ex. C.)[2]  When Jamie explained that she could not provide that information, Chevalier

---

[2] Defendants quote some portions of this recording in their 56.1 Statement.  (Ds' 56.1
Statement ¶ 3.)  Chevalier "disputes" the content of these quotations, (P's Opp. at 3), but does so
without pointing to any evidence of his own or explaining the basis of the dispute.  Plaintiff also
disputes other portions of Defendants' 56.1 Statement, including quotes from two other
recordings, without explaining the basis for the dispute and without identifying any evidence
supporting his assertion.  (*Id.*)  In his deposition, he conceded the authenticity of the recordings.
Shah Decl. Ex. F ("Chevalier Dep.") at 32:17-33:9, 36:2-37:1, 42:16-43:14.)

Local Rule 56.1 provides that "[e]ach statement by the . . . opponent pursuant to Rule
56.1(a) and (b), including each statement controverting any statement of material fact, must be
followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ.
P. 56(c)."  Generally, "[p]*ro se* litigants are . . . not excused from meeting the requirements of
Local Rule 56.1" where the opposing party notifies the *pro se* litigant of Local Rule 56.1's
requirements, but "the Court retains some discretion to consider the substance of the plaintiff's
arguments, where actually supported by evidentiary submissions."  *Wali v. One Source Co.*, 678
F. Supp. 2d 170, 178 (S.D.N.Y. 2009).  Here, Defendants notified Chevalier of, among other
things, his obligations under Local Rule 56.1, (Doc. 34), and thus Chevalier is not excused from
complying with the rule.  That said, the Court has reviewed (and cited to) the actual recordings.
Thus, the Court may determine whether Chevalier's arguments are supported by the evidentiary
record, and disregards them where they are not.

stated, "I don't want to hear that.  You better answer my fucking goddamn question.  I'm going to ask this one time. . . .  I'm going to ask you one more time where the fuck these goddamn people work at."  (*Id.*)  When Jamie again said that she could not provide that information "for safety reasons," Chevalier stated, "I hope you fucking die and get killed, you understand me? . . . I hope your kids get raped and get killed, you understand me?"  (*Id.*)

On March 14, 2018, Chevalier again called the NYC DOF and this time spoke with an individual who identified herself as "Melissa."  (Shah Decl. Ex. D.)  Chevalier explained that he had just paid off his fines, but there was still a boot on his car.  When Melissa tried to explain to Chevalier the next steps that needed to be taken to get the boot of his car, he repeatedly told her to "be quiet."  (*Id.*)  Chevalier began cursing at Melissa and explained that he needed a "goddamn combination number so I can go to fucking work, I'm already late for work."  (*Id.*) When Melissa explained that she could not provide Chevalier with a combination to unlock the boot because he did not leave a credit or debit card on file, Chevalier said, "Why you telling me this?  You really trying to make me go to jail, lose my temper or something."  (*Id.*)  When Melissa explained that it was the NYC DOF's policy, Chevalier said, "They never fucking said that before.  What the fuck you talking about ma'am?"  (*Id.*)  After Melissa again tried to explain the NYC DOF's policy, Chevalier stated, "I swear to god when I find this guy who put this boot on, his ass is grass.  I swear on everything I love.  I swear to fucking god. . . .  I know I'm going to jail.  I know I'm going to lose my temper today. . . .  I swear to god I'm going to lose my temper today.  I swear to fucking god, ma'am."  (*Id.*)  At his deposition, Chevalier explained that the phrase "his ass is grass" is "an old-school term saying you going to beat somebody up."

(Chevalier Dep. at 38:17-20.)[3]  Chevalier then agreed to give a card number so that Melissa could give him the combination to remove the boot from his car.  (Shah Decl. Ex. D.)  When Melissa tried to confirm his billing information, Chevalier told her to "fucking listen."  (*Id.*)  She explained that it was hard for her to hear him, and he said it was because he was "on the fucking goddamn train."  (*Id.*)  Chevalier then stated, "Are you fucking stupid or something? . . .  You're asking me a bunch of stupid questions now" because his billing address was the same address listed on his vehicle registration.  (*Id.*)  Melissa explained that she did not have access to his vehicle registration information, to which Chevalier responded, "Will you fucking hurry up, you're wasting my time."  (*Id.*)  Chevalier then stated, "I'm going to be looking for these people that put this boot on. . . .  I know I'm going to fucking act out and end up going to Rikers."  (*Id.*)  He made other statements such as, "I hope to god I find that guy who put that boot on," and "I hope to god I find that particular vehicle that was doing that.  I will be looking for him.  I will be looking for him."  (*Id.*)  Melissa gave Chevalier the code to unlock the boot on his vehicle, and she provided him with the address where he should return the boot.  (*Id.*)  Chevalier asked, "Who works over there?" and added, "I need to hopefully see the people who put the boot on over there.  I need to be able to do that."  (*Id.*)  Melissa explained that no officers worked at the drop-off location.  At the end of the call, Chevalier said to Melissa, "You know what?  Fuck you.  I hope you fucking die."  (*Id.*)

On March 16, 2018, Chevalier called NYC DOF again.  (Shah Decl. Ex. E.)  By this time, Chevalier had already removed the boot from his vehicle.  (Ds' 56.1 Statement ¶ 6.)

---

[3] Defendants attached to the Shah Declaration a transcript of Chevalier's deposition without incorporating the corrections that Chevalier provided to Defendants on an Errata Sheet. (Doc. 46 ("Ds' Reply") at 9-10.)  After Plaintiff pointed out this error, (P's Opp. at 11-12), Defendants provided the Errata Sheet with their reply papers, (Doc. 47-1).  The Court will incorporate the corrections into the deposition transcript when considering it.

Chevalier spoke with an individual (whose name the Court could not make out on the recording), who asked Chevalier to provide his violation number. (Shah Decl. Ex. E.) After Chevalier provided the number, the individual confirmed it, to which Chevalier responded, "How you can't understand six fucking digits?" (*Id.*) She asked if she had gotten the number wrong, and Chevalier stated, "Will you open up your fucking ears, you dumb fuck." (*Id.*) The individual asked Chevalier to "refrain from calling [her] names," to which Chevalier said, "I don't care," repeatedly, and "I'll call you whatever I want to call you, you understand me? Because I'm fucking pissed off right now." (*Id.*) Chevalier explained that he was calling about the boot on his car that he "paid off." (*Id.*) The individual responded that her records confirmed that he paid off his tickets and removed and returned the boot. (*Id.*) Chevalier responded, "I want to know where these fucking people work at. Because I'm about to kill somebody right now. I'm fucking mad." (*Id.*) Chevalier repeatedly yelled at and cursed at the individual on the phone asking where the scofflaw officers worked. (*Id.*) The individual from NYC DOF explained that Chevalier could file a complaint at the NYC DOF office, but Chevalier yelled at her, telling her repeatedly that she was "fucking playing" with him, and said that that is not where the officers worked. (*Id.*) Chevalier, stated, "I'm going to ask you one more time, where these people work at ma'am," to which she said that he should go to the NYC DOF to find that information. (*Id.*) She then asked if there was anything else she could help him with, to which Chevalier responded, "You're lucky you're not in front of me right now cause I'd kill your fucking ass. I hope you fucking die, you motherfucker. I hope you fucking die, man." (*Id.*) The individual said, "Thank you so much," to which Chevalier said, "No fuck you. I hope your kids die too. You fucking made me late for work on Tuesday. You're going to fucking die, ma'am," and hung up. (*Id.*)

Later that same evening, on March 16, uniformed police officers went to Plaintiff's home, but Plaintiff did not open the door for them because he feared that he would be arrested if he did so. (Ds' 56.1 Statement ¶ 9; Chevalier Dep. at 46:9-47:24.) In his opposition to Defendants' motion, Plaintiff stated,

> Plaintiff did open the door for the police on Friday March [16] 2018 to avoid being seen escorted out in handcuffs by fellow neighbors and relatives that resided in the area. His main intention was to go [to] the local precinct immediately after he finished his work shift on Saturday March 17, 2018.

(P's Opp. at 3.) As an initial matter, it is apparent that the phrase "did open the door" was a typographical error, as what followed was an explanation as to why he did not open the door. And in any event, Chevalier was clear during his deposition that he "did not open [the door] for them," (Chevalier Dep. at 46:12), because he suspected he would be arrested for what he had said in the phone calls, (*id.* at 46:23-47:20), and a party's affidavit (let alone an unsworn statement) that contradicts his own prior deposition testimony "should be disregarded on a motion for summary judgment." *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987); *see Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) ("[F]actual issues that a party creates by filing an affidavit crafted to oppose a summary judgment motion that contradicts that party's prior testimony are not 'genuine' issues for trial."). Accordingly, the Court accepts as true for purposes of this motion that Plaintiff did not open the door for the officers, yet he knew that they were likely there to arrest him for what he said on the phone calls to NYC DOF. (Chevalier Dep. at 46:23-47:17.)

On March 17, 2018, while Chevalier was at work, he received a call from a private number. (Ds' 56.1 Statement ¶ 10.) The individual on the phone stated that he was from the NYC DOF and that he wanted to resolve the matter, and he asked where Chevalier was so that they could meet. (*Id.*) Chevalier provided his work address at the "EF Academy" school, where

Chevalier was a food service worker.  (*Id.*; Chevalier Dep. at 29:2-8.)[4]  About an hour later, the four individual Defendants arrived at Plaintiff's place of employment and arrested him.  (Ds' 56.1 Statement ¶ 11.)  Plaintiff alleges that he was still in his work attire, was extracted from his job in handcuffs in public view, and lost his job as a result of his arrest.  (P's Opp. at 9; AC at 4, 8.)

Plaintiff was arrested on charges of Aggravated Harassment in the Second Degree, N.Y. Penal Law § 240.30(02); Menacing in the Third Degree, N.Y. Penal Law § 120.15; and Disorderly Conduct by Obscene Language/Gestures, N.Y. Penal Law § 240.20(03), (Ds' 56.1 Statement ¶ 12), although he states that did not learn what he was charged with until months after his arrest, (P's Opp. at 3-4).  In his AC, Chevalier alleges that after he was handcuffed, he suffered shoulder pain while being transported to the "Sheriff's complex."  (AC at 8.)  Chevalier states that he was fingerprinted twice and placed in central booking before his release, which was a little more than twenty-four hours after his arrest.  (*Id.* at 9; *see* P's Opp. at 4.)  Chevalier's criminal charges were dismissed prior to arraignment, and he was not criminally prosecuted in relation to this incident.  (Ds' 56.1 Statement ¶ 13.)

Chevalier's arrest report notes that a complainant/victim filed a complaint with the New York City Sheriff's Office because she feared for her safety after Chevalier called her and stated that he hoped she died, that he hoped her kids got raped, and that he knew he was going to Rikers.  (Shah Decl. Ex. B ("Arrest Report").)  The Arrest Report further notes that after officers

---

[4] According to Plaintiff, EF Academy is located in Thornwood in Westchester County. (Doc. 10 ("AC") at 4.)  The AC is not consecutively paginated, so references are to the page numbers generated by the Court's Electronic Case Filing System stamped at the top of each page.

from the Sheriff's Office were unable to apprehend Chevalier at his home, they referred the case to the Kings County Warrants Unit, which was able to apprehend Chevalier the next day.  (*Id.*)

Chevalier states that, in April 2018, he went to City Hall and left his Notice of Claim with an individual at the front desk of the office of the New York City Comptroller.  (P's Opp. at 4.)  He further states that the Notice of Claim he left there was likely misplaced.  (*Id.*)  On April 12, 2018, the New York City Comptroller's Office sent Chevalier a letter stating that his Notice of Claim was rejected and returned because it was not properly served on the City of New York.  (Shah Decl. Ex. I.)  Defendants therefore assert that Plaintiff failed to timely file a Notice of Claim.  (Ds' 56.1 Statement ¶ 15.)

### B.   Procedural History

On June 6, 2018, Chevalier filed a Complaint against the City of New York and four "Unknown" officers.  (Doc. 1.)  The Court ordered Defendants' counsel to identify the four officers, (Doc. 5), which they did on October 12, 2018, (Doc. 8.  On October 23, 2018, Plaintiff filed his Amended Complaint against the four officers and the City.  (AC.)  In his AC, Chevalier brings a claim for "unlawful arrest and imprisonment," which he alleges constitutes a "violation of [his] 4th Amendment Rights protected under the United States Constitution."  (AC at 4.)  Defendants timely answered.  (Doc. 11.)

On February 20, 2019, Alexandra Corsi, senior counsel from the New York City Law Department, wrote a letter to the Court describing a meeting between Chevalier and Shah, Defendants' then-counsel.  (Doc. 21.)  The letter explained that Shah contacted Chevalier so that they could confer on a case management plan.  (*Id.* at 1.)  Shah suggested that they confer over the phone, but Chevalier demanded they do it in person and shortly thereafter arrived at the New York City Law Department's office.  (*Id.* at 1-2.)  According to Shah, Chevalier acted

"aggressively," causing Shah to feel "apprehension," so Shah "terminated the meeting." (*Id.* at 2)  Approximately one week later, Shah received a letter from Chevalier, in which Chevalier accused Shah of making "uneducated statements" in Defendants' answer, stated that Shah was in the "business of defending low life pigs," and added that he thought Shah was "transgender because [he] sound[ed] like a woman on the phone."  (*Id.* Ex. A.)  Chevalier also accused Shah of treating Chevalier like "just another person from the inner[ ]city."  (*Id.*)

On February 26, 2019, the Court held a status conference, during which it entered a civil case management plan.  (Minute Entry dated Feb. 26, 2019.)  At that conference, the Court explained to Chevalier that his letter to Shah was inappropriate, and the Court expected Chevalier to behave appropriately moving forward.  (*Id.*)  As far as the Court can tell, Chevalier has litigated respectfully since that conference.

At the February 2019 conference, the Court set another conference date for September 17, 2019, after the conclusion of discovery.  (*Id.*)  Defendants submitted a pre-motion letter two weeks before the September conference as directed, but Chevalier did not respond as directed, (*id.*), and did not appear at the conference, (Minute Entry dated Sept. 17, 2019).  On October 1, 2019, pursuant to this Court's Order, Chevalier submitted a letter explaining that he had not properly marked down the September conference date in his calendar and that his failure to attend was an oversight.  (Doc. 32.)  He also blamed Shah for not reminding him of the conference date. (*Id.*)

Plaintiff clarified his claims in a September 20, 2019 letter to the Court, in which he stated that he is not bringing a malicious prosecution claim but instead is "suing for wrongful

arrest, imprisonment, pain and suffering and emotional distress." (Doc. 31 at 6.)[5] Accordingly, the Court understands that Chevalier is bringing claims of false arrest, in violation of his Fourth Amendment rights, pursuant to 42 U.S.C. § 1983, and in violation of New York State law. *See Hart v. City of N.Y.*, No. 11-CV-4678, 2013 WL 6139648, at *3 (S.D.N.Y. Nov. 18, 2013) ("[U]nder New York law, the torts of false arrest and false imprisonment are 'synonymous.'")[6] Because Chevalier also brings a claim against the City, the Court considers his AC to bring a *Monell* claim stemming from his false arrest.[7]

On October 17, 2019, Defendants moved for summary judgment, and filed with their motion a memorandum of law, (Doc. 37 ("Ds' Mem.")), as well as their 56.1 Statement and attorney declaration and exhibits, (Docs. 35-36). After requesting and receiving an extension, Chevalier filed an opposition, which included a memorandum of law as well as his response to Defendants' 56.1 Statement. (P's Opp.) Defendants filed a reply memorandum, (Ds' Reply), as well as a reply to Plaintiff's 56.1 response, (Doc. 48), and an attorney declaration with one exhibit, (Doc. 47).

On February 19, 2020, Chevalier filed a sur-reply in which he included mostly the same arguments – word-for-word – that he made in his opposition. (Doc. 50.) Defendants filed a

---

[5] False arrest provides a remedy for the deprivation of liberty between a warrantless arrest and arraignment, and malicious prosecution provides a remedy for post-arraignment deprivations of liberty. *See Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995). Because the charges against Plaintiff were dismissed before arraignment, no malicious prosecution claim would lie.

[6] My chambers will send Plaintiff copies of any unreported decisions cited in this Opinion.

[7] Plaintiff stated in his AC that he felt shoulder pain after he was handcuffed, but even reading his AC liberally, that does not rise to the level of an excessive force claim. And even if he had brought an excessive force claim, he has not made any allegations or adduced any evidence that any officer used force on him, let alone excessive force.

letter shortly thereafter requesting that the Court disregard Chevalier's sur-reply.  (Doc. 51.)

Chevalier is a *pro se* litigant, his sur-reply did not advance new arguments, and the Court knows

what to do with unauthorized sur-replies, so Defendants' letter was unnecessary.  In any event,

the Court has reviewed Plaintiff's sur-reply, and it does not change the outcome, so it does not

matter whether the Court considers it on this motion.

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence

sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d

Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The mere existence of a

scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at

252.  Moreover, the non-movant "must do more than simply show that there is some

metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated

speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal

quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . .

admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where an

affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the affiant . . . is competent to

testify on the matters stated."  *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino,

Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address

another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact

undisputed for purposes of the motion" or "grant summary judgment if the motion and

supporting materials – including the facts considered undisputed – show that the movant is

entitled to it."  Fed. R. Civ. P. 56(e).

In addition, *pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*,

623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are

concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).

## III.   DISCUSSION

### A.   False Arrest

False arrest claims under § 1983 are analyzed under the law of the state in which the

arrest occurred.  *See Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004).  The arrest here

occurred in New York, and to prevail on a false arrest claim under New York law, a plaintiff

must demonstrate that (1) the defendant intentionally confined him, (2) the plaintiff was aware of

being confined, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not justified or otherwise privileged. *See Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003). Only the fourth requirement is in dispute here.

### 1. Probable Cause

An arrest is justified or privileged if it is based on probable cause. *LaFontaine v. City of N.Y.*, No. 08-CV-1555, 2009 WL 3335362, at *5 (S.D.N.Y. Oct. 14, 2009); *see Singer*, 63 F.3d at 118 ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."). Probable cause exists when an officer has "'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Jocks*, 316 F.3d at 135 (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

"[P]robable cause is evaluated under an objective standard," *Michaels v. City of N.Y.*, No. 10-CV-2666, 2011 WL 570125, at *5 (S.D.N.Y. Feb. 16, 2011) (internal quotation marks omitted), under which "courts look to the information available to the law enforcement officer at the time of the arrest and consider the 'totality of the circumstances,'" *id.* (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *accord Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). Because probable cause is evaluated under an objective standard, it need not be "predicated upon the offense invoked by the arresting officer, or even upon an offense 'closely related' to the offense invoked by the arresting officer," and "the 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'" *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). The focus is simply on "the validity of the *arrest*, and not on the validity of each charge." *Id.* at 154 (emphasis in original). In other words, if Defendants had probable cause to

arrest Chevalier for any crime, the arrest was privileged and cannot form the basis of a false arrest claim under 42 U.S.C. § 1983.

Defendants had, at the very least, probable cause to arrest Chevalier for Aggravated Harassment in the Second Degree.  "A person is guilty of aggravated harassment in the second degree when . . . [w]ith intent to harass or threaten another person, he or she makes a telephone call, whether or not a conversation ensues, with no purpose of legitimate communication."  N.Y. Penal Law § 240.30(02).  On March 16, Chevalier called an individual at the NYC DOF after the boot had been removed from his vehicle.  While on the call, he immediately started speaking aggressively toward the NYC DOF employee, repeatedly raising his voice at her and cursing at her.  (Shah Decl. Ex. E.)  He then stated that he wanted to know where the scofflaw officers worked because he was "about to kill somebody."  (*Id.*)  After the NYC DOF employee repeatedly tried to assist Chevalier by telling him where he could file a complaint against the scofflaw officers, Chevalier stated to her, "You're lucky you're not in front of me right now cause I'd kill your fucking ass.  I hope you fucking die, you motherfucker.  I hope you fucking die, man. . . .  [F]uck you.  I hope your kids die too.  You fucking made me late for work on Tuesday.  You're going to fucking die, ma'am."  (*Id.*)  This language was both harassing and threatening.  Chevalier told the individual that he would have harmed her if she were in front of him, showed that he was determined to seek and find individuals who he believed wronged him, and ended the call with a direct threat.[8]  It is no surprise that these threats and aggressive

_____

[8] The Court may consider the NYC DOF employee's statements reproduced in the police report not for their truth but for the fact that they were made. *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 605-06 (S.D.N.Y. 2013) ("[T]o the extent that the police report includes statements made by the confidential informant, such statements are admissible since Defendants do not offer them for their truth but rather as evidence that the statements were made . . . .").

language scared the individual sufficiently that she filed a complaint with the Sheriff's office alleging that she feared for her safety.  (Shah Decl. Ex. B.)

The individual's complaint alone was sufficient to establish probable cause.  *Hart*, 2013 WL 6139648, at \*4 ("A complaint from the putative victim is generally sufficient to establish probable cause.") (citing *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)).[9]  The recordings alone would also have sufficed.  Further, there was no legitimate purpose for this call because the boot had already been removed from Chevalier's car.  Indeed, Chevalier so admits, as he stated that the phone call was "solely a venting of anger and frustration."  (P's Opp. at 6; *see* Chevalier Dep. at 75:1-6 (conceding that only purpose of threats was to express anger).)  Accordingly, Chevalier's actions provided Defendants with probable cause to arrest him for aggravated harassment in the second degree, and because Defendants had probable cause to arrest him for that charge, the arrest was privileged and cannot form the basis of a false arrest claim under 42 U.S.C. § 1983.  *See Jaegly*, 439 F.3d at 153-54.[10]

Chevalier responds that he has two "[d]efensive [t]heories" to any charge brought against him, therefore undermining any probable cause that the Defendants had to arrest him.  (P's Opp. at 6-7.)  Chevalier's first theory is that his speech was protected by the First Amendment,[11] and

---

[9] While reliance on a complainant may be insufficient if the officer has reason to doubt the victim's veracity, *see Singer*, 63 F.3d at 119, there was no such reason here, especially given that Chevalier's threatening statements were recorded.

[10] Because Defendants had probable cause to arrest Chevalier for one crime, the entire arrest is privileged, and the Court need not analyze whether there was probable cause for each of the crimes charged in the arrest report or any other crime.  *See id.* at 154.

[11] Chevalier invokes the First Amendment as a potential defense to any charge brought against him, but he does not argue that he has a First Amendment claim against Defendants.  Even if he did so argue, at no time prior to his opposition did Chevalier raise any First Amendment claim, and Chevalier cannot amend his AC in a memorandum in opposition to a motion for summary judgment.  *See Lyman v. CSX Transportation, Inc.*, 364 F. App'x. 699, 701

his second theory is that he would be entitled to present to a jury the full context in which his allegedly threatening statements were made to determine if his statements were in fact threatening.  But while these defenses may have been available to Chevalier had he been prosecuted in court, they do not vitiate the probable cause to arrest him.  "[O]nce officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury.  Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Panetta*, 460 F.3d at 396 (internal quotation marks omitted).  Further, it is well settled that officers are "not required to explore and eliminate every plausible claim of innocence before making an arrest." *Jaegly*, 439 F.3d at 153; *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir.1997) (officer not required to believe arrestee's version of events, and once he has reasonable basis for believing probable cause exists, he need not explore "every theoretically plausible claim of innocence").  Even assuming that Chevalier had an innocent explanation for his threats or that they were protected under the First Amendment (neither of which he has shown here), and even assuming he had explained to the Defendants that he was innocent prior to his arrest (which he also has not shown here), the Defendants were not required to credit Chevalier's protestations of innocence or First Amendment protection.  *See Panetta*, 460 F.3d 388, 395-96 (2d Cir. 2006) ("[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause.")  The Defendants relied on a victim's complaint that Chevalier had engaged in criminal harassment toward her, which conduct was recorded, and they were entitled "to credit the statements made by the purported crime victim . . . and were not required to accept or investigate

---

(2d Cir. 2010) (summary order) (affirming district court's determination that it should not consider claims raised for the first time in opposition to summary judgment).

[Plaintiff's] contrary statements," even assuming he had made them. *Sunan Yan v. City of N.Y.*, 510 F. App'x 59, 60 (2d Cir. 2013) (summary order).[12]  Accordingly, Chevalier's defensive theories do not vitiate the Defendants' probable cause to arrest him.[13]

Chevalier also argues that Defendants "willfully acted in an unreasonable manner and negligent manner" when they arrested Chevalier in his workplace and held him for more than twenty-four hours. (P's Opp. at 9.)  But Chevalier does not point to any facts to support his conclusion that Defendants acted willfully.  Rather, to support his contention, he cites to two other cases in which plaintiffs received damages as a result of police misconduct.  The first case is "*Jamal Butler versus the Baltimore Police Department*," in which, according to Chevalier, officers were held liable for detaining plaintiff for twelve hours and forcing him to miss a day of work. (*Id* at 9-10.)  The second is *Wellner v. City of N.Y.*, 16-cv-7032 (S.D.N.Y.), in which a plaintiff received a jury verdict for $1.2 million for claims of excessive force. (*Id.* at 10.)[14]  But

---

[12] Although the court does not consider the Arrest Report for the truth of the matters asserted therein, the court may consider it to determine the information available to the arresting officers at the time. *See Franks v. City of N.Y.*, No. 13-CV-6254, 2017 WL 1194500, at *4 (E.D.N.Y. Mar. 31, 2017) (collecting cases).  In other words, "the contents of the police reports . . . to the extent that they reflect statements made to police officers . . . are not offered for the truth of the matter asserted but for the purpose of showing that these statements were made to the officers and provided probable cause to arrest and prosecute [Chevalier]." *Cooper*, 925 F. Supp. 2d at 606.

[13] To the extent that Chevalier argues that the dismissal of the criminal charges provides a basis to bring the instant claims to trial, that argument is "not persuasive.  The legal standard for probable cause is, of course, entirely distinct from that applied by a judge in adjudicating a motion to dismiss.  If Plaintiff was correct, the dismissal of criminal charges would automatically render the prior arrest of the defendant illegal.  This cannot be the case." *Dorn v. Maffei*, 386 F. Supp. 2d 479, 484 (S.D.N.Y. 2005).  Further, the record contains no indication that a judge found the charges against Plaintiff to be insufficient.

[14] After the jury awarded $1.2 million to Wellner, the court granted the defendant's motion for remittur and allowed plaintiff to accept a remitted award of $200,000. *Wellner v. City of N.Y.*, 393 F. Supp. 3d 388, 401 (S.D.N.Y. 2019), *reconsideration denied*, No. 16-CV-7032, 2019 WL 5538064 (S.D.N.Y. Oct. 25, 2019).

those cases cannot be used to establish a genuine dispute of fact regarding the Defendants' willfulness here.  First, claims against officers from the Baltimore Police Department, without any indication that any officer from New York City – let alone any Defendant in this case – was involved, cannot establish that Defendants here acted willfully.  Second, there is no indication that the facts of those cases were in any way similar to the facts here.  In fact, Chevalier explains that the *Wellner* case involved claims of excessive force.  Accordingly, neither the *Butler* nor the *Wellner* cases can be used to establish a genuine dispute of material fact in the instant case regarding whether the Defendants acted willfully.  Finally, even if there were an indication that the officers acted willfully, which there is not, "[t]he probable cause inquiry focuses on the information available to the officer at the time of arrest; an officer's subjective intent is irrelevant."  *Espada v. Schneider*, 522 F. Supp. 2d 544, 552 (S.D.N.Y. 2007).

Accordingly, Defendants are entitled to summary judgment on Chevalier's false arrest claim.[15]

---

[15] While Plaintiff's false arrest claim will not make it to a jury, he should understand that his claim for damages due to embarrassment and humiliation suffered at his place of work would likely fall of deaf ears.  Plaintiff was rude and degrading while speaking with the NYC DOF employees who were merely doing their jobs and remained professional despite Chevalier's onslaught of insults and threats.  Chevalier cursed at them, told them he hoped that they would die, and told them he wished that their children would be raped (which was particularly surprising considering his job as a food service worker in a school).  The chances that any jury would award damages to someone who was arrested for engaging in such behavior are virtually nil.  Chevalier was also disrespectful and behaved inappropriately toward Defendants and their counsel, calling Defendants "low life pigs," making numerous disparaging remarks to Defendants' counsel, and claiming that Defendants' counsel sounded like a "transgender" person (an irrelevant remark that shows nothing other than perhaps Chevalier's bias toward transgender people).  Further, disturbingly, Chevalier still seems to think that:  a) he is entitled to know where to find law enforcement officials he has threatened; and b) anger at having his car immobilized for failure to pay parking tickets excuses his threats.  (*See, e.g.*, P's Opp. at 5-6.)

### 2.      Qualified Immunity

Even if Chevalier had established a genuine dispute of material fact regarding whether the Defendants had probable cause to arrest him, the Defendants would be protected by qualified immunity.

When accused of making a false arrest, an officer is entitled to qualified immunity if there was "'arguable' probable cause" at the time of arrest.  *Jenkins v. City of N.Y.*, 478 F.3d 76, 87 (2d Cir. 2007).  Arguable probable cause to arrest "exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met."  *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (internal quotation marks omitted).

Here, Defendants received a complaint alleging that Chevalier said, on a recorded line, that he wanted to kill the officers who had booted his car and that he hoped the individual would "die" and her children would "get raped."  (Shah Decl. Ex. B.)  As noted, these allegations establish probable cause that Plaintiff intended to harass or threaten the individual, but even if they did not, it cannot be said that Defendants' "judgment was so flawed that no reasonable officer would have made a similar choice" in arresting Chevalier because of his threats.  *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995).  It is simply not the case that every reasonable officer would agree that Plaintiff's conduct was not criminal.  Accordingly, Defendants would be entitled to qualified immunity even if they lacked probable cause to arrest him.

### B.      *Monell* Claim

The Court need not address *Monell* liability because the underlying constitutional claim does not survive.  "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that

organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original). "Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom or policy of the municipality." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). Here, Chevalier failed to raise a genuine of issue of fact regarding whether he suffered a constitutional tort, as discussed above, and therefore, he cannot maintain a *Monell* claim.

Even if Chevalier had established that he suffered a constitutional violation, the City would still be entitled to summary judgment. "To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007) (alteration and internal quotation marks omitted). To plausibly allege an official policy or custom, the plaintiff must plead:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees.

*Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *15 (S.D.N.Y. Jan. 24, 2013) (internal quotation marks omitted), *aff'd*, 751 F.3d 78 (2d Cir. 2014). "[M]ere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details."

*Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015).

The AC contains no allegations – even conclusory ones – that would support a theory of municipal liability.  Accordingly, Chevalier's conclusory argument that he "set forth a cognizable municipal liability claim," (P's Opp. at 11), is rejected.

Chevalier argues that he has established a genuine dispute of material fact regarding whether the City is liable under *Monell* because a New York City scofflaw agent, working for a private contractor for the City, was arrested in 2013 on charges of bribery and petit larceny.  (P's Opp. at 10-11.)  But this argument is irrelevant.  First, Chevalier's *Monell* claim is premised on Chevalier's false arrest, not on anything that the scofflaw agents or agents did when booting his car.  Even if the City had a policy or custom of permitting scofflaw agents to engage in bribery or petit larceny, it would have nothing to do with any policy or custom regarding false arrests by officials of other agencies.  Second, even assuming that scofflaw agents were involved in Chevalier's arrest, Chevalier does not show any policy or custom.  Pointing to a single incident that was in no way "factually similar to the present case" or "plausibly connected to the alleged deprivation of the Plaintiff's constitutional rights in this case," is insufficient for a *Monell* claim. *Stratakos v. Nassau County*, No. 15-CV-7244, 2016 WL 6902143, at *5 (E.D.N.Y. Nov. 23, 2016).

Accordingly, the City is entitled to summary judgment on Chevalier's *Monell* claim.

## C.     State Law Claims

Typically, the Court would dismiss Chevalier's state law claim without prejudice because it is dismissing his federal claims.  But "the statute governing supplemental jurisdiction, 28 U.S.C. § 1367, does not require dismissal of pendent claims where all of the federal claims have

been dismissed." *Bishop v. Henry Modell & Co.*, No. 08-CV-7541, 2009 WL 3762119, at *15 (S.D.N.Y. Nov. 10, 2009), *aff'd*, 422 F. App'x 3 (2d Cir. 2011) (summary order).  And where "the parties have already completed discovery," and where "the state law claim will not require resolution of any difficult questions of state law," the Court may properly exercise its discretion to retain supplemental jurisdiction over the plaintiff's state law claim.  *Finkelstein v. Mardkha*, 495 F. Supp. 2d 329, 345 (S.D.N.Y. 2007); *see Motta v. First Unum Life Ins. Co.*, No. 09-CV-3674, 2011 WL 765838, at *1 (E.D.N.Y. Feb. 24, 2011) ("When discovery is complete, a case is ready for trial, and the state law claims involve only settled principles not novel legal questions, it is proper for a district court to retain jurisdiction.") (internal quotation marks and alteration omitted).

Here, discovery is complete.  Chevalier's only state law claim is for false arrest, and it is well-settled law in New York that "probable cause is a complete defense to a false arrest claim under . . . New York law." *Rodriguez v. County of Suffolk*, 63 N.Y.S.3d 693, 694 (App. Div. 2017).  Chevalier's claim thus does not raise a novel issue of state law, as it is controlled by well-settled precedent.  Accordingly, the Court exercises its discretion to retain jurisdiction over Chevalier's state law false arrest claim.

Chevalier's state and federal claims for false arrest are "substantially the same," *Jocks*, 316 F.3d at 134; *see Washington-Herrera v. Town of Greenburgh*, 956 N.Y.S.2d 487, 489 (App. Div. 2012) (same), and probable cause is a "complete defense" to both, *Rodriguez*, 63 N.Y.S.3d at 694.  As discussed above, Defendants had probable cause to arrest Chevalier, and therefore Defendants have a complete defense to Chevalier's false arrest claim under both federal and state law.  *See Defrancesco v. Gilham*, No. 06-CV-1070, 2009 WL 3719415, at *5 (N.D.N.Y. Nov. 4, 2009) (granting summary judgment on federal and state law false arrest claims in interest of

judicial economy).  Accordingly, Defendants are entitled to summary judgment on Plaintiff's false arrest claim under New York law.[16]

## IV.    **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED.[17] The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 33), and close the case.

**SO ORDERED.**

Dated:  April 16, 2020
         White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

---

[16] Because the Court is dismissing Plaintiff's state law claim, it need not reach the issue of whether Chevalier failed to timely file a Notice of Claim.

[17] Chevalier's opposition to Defendant's motion raises some additional arguments, but the Court finds that they are not relevant to the instant motion.  First, Chevalier states that Defendants' counsel "annexed a 64 page record of plaintiff's record of past arrests and convictions of which have no involvement in his present claim against the city of New York." (P's Opp. at 7.)  But Defendants' counsel did not submit anything to this Court regarding Chevalier's past arrests or convictions, and even if it had, the Court would not have considered those documents on this motion.  Chevalier also claims that Defendants' counsel was negligent in this case for asking Chevalier to produce certain relevant documents, for not reminding Chevalier of a scheduled conference, and for not incorporating the changes from Chevalier's Errata Sheet into his deposition transcript.  (*Id.* at 11-12.)  But none of these allegations have any bearing on this Opinion and Order or the merits of Defendants' summary judgment motion, and therefore the Court does not address them further here.